21

1  A    That's correct.

2  Q    And no - was the - you have talked about a, in your

3  affidavit and testimony about a purchase of heroin, a purchase

4  of cocaine and a purchase of a gun, correct?

5  A    That's correct.

6  Q    Did you make suggestions to the confidential informant

7  about what might be bought from Mr. Rivera?

8  A    After receiving the information from the confidential

9  informant as to previous discussions that the informant had

10 with Mr. Rivera, he may be aware of items that Mr. Rivera had

11 provided to the informant himself.

12 Q    And again, is there any kind of memorialization of these

13 conversations you had with the confidential informant?

14 A    The report one, I believe it is, is the official report

15 and it's debriefing the CI.

16 Q    So there is a debriefing report?

17 A    That's correct.

18 Q    And then after that you suggested items that the

19 confidential informant might get from Mr. Rivera?

20 A    Yes.

21 Q    And the confidential informant followed through on trying

22 to get those items?

23 A    That's correct.

24 Q    So did you suggest that he try to purchase heroin?

25 A    I suggested that he try to purchase a firearm, and if he

1  was able to purchase narcotics with the firearm, he said he'd
2  suggest that.
3  Q    The first occasion was for heroin and not a firearm; is
4  that correct?
5  A    The purchase was for heroin; that's correct.
6  Q    On that occasion, you had been asking the confidential
7  informant to get a firearm, but he came back with heroin?
8  A    Well, we knew at some pint that the firearm may or may not
9  be part of the sale.
10 Q    And in terms--
11 A    He did come back with the heroin first.
12 Q    And then again you asked for the purchase of a firearm; is
13 that correct?
14 A    Correct.
15 Q    And that is the one that you talked about in the affidavit
16 that did happen two months later, is that correct, a month and
17 a half?
18 A    I don't believe it was that long.
19 Q    At some period of time later?
20 A    Yes.
21 Q    And then there was one final sale, purchase of cocaine?
22 A    That's correct.
23 Q    That was not a firearm or was there an attempt to buy a
24 firearm at that time?
25 A    No.

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

23

1  Q    Did you suggest to the confidential informant they should
2  try and buy cocaine?
3  A    I suggested to the confidential informant he should buy
4  whatever narcotics or firearms he thought Mr. Rivera would sell
5  him.
6  Q    Did you specifically mention crack cocaine?
7  A    Yes, I did.
8  Q    Did you urge the confidential informant to try and buy
9  crack cocaine from Mr. Rivera?
10 A    Yes, I did.
11          THE COURT:  Well, what was it that he purchased?
12          THE WITNESS:  It was powder cocaine, your Honor.
13          THE COURT:  Okay.
14 BY MR. WATKINS:
15 Q    And while we're on that subject, that substance was bought
16 about 10 days ago at this point; is that correct?
17 A    That's correct.
18 Q    And has that substance been analyzed?
19 A    It's in the process of being now.
20 Q    There was an initial test done at the New Bedford police
21 station; is that correct?
22 A    That's correct.
23 Q    And that was done by Sergeant Olivera?
24 A    That's correct.
25 Q    You mentioned in your affidavit that that tested positive

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

24

1  for cocaine base.
2          MS. LEONEY:  Excuse me.
3          MR. WATKINS:  I'm sorry.
4          MS. LEONEY:  I don't believe the affidavit said
5  cocaine base.  I believe it said cocaine. I think you're
6  referring to the draft report.
7  BY MR. WATKINS:
8  Q    I'm going to direct you to paragraph 18 of your affidavit.
9          THE COURT:  Here, give me a minute.
10         MS. LEONEY:  I apologize, sorry.
11 BY MR. WATKINS:
12 Q    Is it safe to say your affidavit talks about the substance
13 testing positive for cocaine base?
14 A    Yes, it does.
15 Q    And that was on the basis of your conversations with
16 Sergeant Olivera?
17 A    That's correct.
18 Q    And do you know what test was used to determine that it
19 was cocaine base as opposed to cocaine?
20 A    What you usually use is a Scott Reagent (ph) field test
21 kit.
22 Q    And are you familiar with that reagent field test?
23 A    Basically.
24 Q    Do you know whether it is able to discriminate between
25 cocaine and cocaine base?

25

1  A    I don't believe it is.

2  Q    Besides that statement in the affidavit and also in the
3  draft report that you wrote, do you have any other indications
4  that this substance was cocaine base rather than powdered
5  cocaine?

6  A    No.

7        THE COURT:  But your belief now is that it was
8  powdered cocaine?

9        THE WITNESS:  Well, I know just from looking at it in
10 my experience it's powder cocaine.

11       THE COURT:  Okay.

12       THE WITNESS:  The term cocaine base that we use is
13 normally what comes back from the lab, so that's how I'm trying
14 to differentiate between the two.  Normally I would just say it
15 came back and it Scott Reagent field test, it tested positive
16 for cocaine.

17 BY MR. WATKINS:

18 Q    But again, based on what Sergeant Olivera told you, you
19 put cocaine base because that's all you had to go on; is that
20 correct?

21 A    I don't recall why I put that in there as such.

22 Q    You talked about a number of reports that you reviewed
23 coming here today.  Those reports that you reviewed as far as
24 Mr. Rivera, did those include reports by the New Bedford police
25 department?

26

1  A    The reports I reviewed were all my own.
2  Q    And there was one by Stephanie Shafer also; is that
3  correct?
4  A    I don't recall. Yes, there is one by Stephanie Schafer.
5  Q    So as I understand, there are two reports that you wrote
6  and then one by Stephanie Schafer?
7  A    That's correct.
8  Q    Stephanie, and were there any other reports concerning
9  Mr. Rivera that you reviewed by someone other than yourself?
10 A    No.
11 Q    Stephanie Schafer's report which you reviewed talks about
12 attachments including an ATF 3400--
13 A    Yes.
14 Q    -- .16. What form is that?
15 A    That's a property receipt form that we use to mark
16 property that goes into our evidence vault.
17 Q    And those are attachments that would ordinarily be
18 included with Ms. Schafer's report? Well, they were in this
19 case, that's correct, let's say as attachments.
20 A    You get attachments or AFT forms that accompany the
21 report.
22 Q    There was also a firearm recovered; is that correct?
23 A    That's correct.
24 Q    Has there ever been any kind of trace report done on the
25 firearm or the bullets?

27

1  A    We're still in the process of doing that.
2  Q    Were there fingerprints taken from the gun or really
3  anything during this case?
4  A    Not as of yet.
5  Q    Do you intend to take fingerprints from the gun or any
6  other evidence in this case?
7  A    We intend to take other evidence, yes.
8  Q    Turning now to Mr. Rivera's arrest, you spoke with his
9  supervisor, Kenneth Crook; is that correct?
10 A    That's correct.
11 Q    Who else did you speak with concerning the arrest of
12 Mr. Rivera?
13 A    Detective Olivera.
14 Q    Besides Detective Olivera anyone else that you spoke to
15 concerning the arrest?
16 A    I may or may not have spoken to other agents or officers
17 that were at the scene.
18 Q    And when you say at the scene, what scene do you mean?
19 A    The search warrant affected at 508-510 Brock Avenue.
20 Q    But just so I'm clear, that's not where Mr. Rivera was
21 arrested; is that correct?
22 A    That's correct.
23 Q    He was arrested at the New Bedford police station?
24 A    That's correct.
25 Q    And he was arrested in the afternoon after having turned

28

1  himself in to the New Bedford police station; is that correct?
2  A    That's correct.
3  Q    You weren't there for that; is that correct?
4  A    That's correct.
5  Q    And supervisor, supervisor Special Agent Crook; is that
6  right?
7  A    Yes.
8  Q    Was he there that you're aware of?
9  A    Yes.
10 Q    And Sergeant Olivera was also at the New Bedford police
11 station?
12 A    That's correct.
13 Q    You talked about attorneys, was there mention of any
14 particular attorney that Mr. Rivera was talking with that day?
15 A    I don't recall.
16 Q    And again, this is based on your conversations with Agent
17 Crook and Olivera, is that correct?
18 A    That's right.
19 Q    So you don't know for sure whether Mr. Rivera showed up at
20 the police station with an attorney or not; is that correct?
21 A    Yes.
22 Q    You spoke about observations during the investigation of
23 508-510 Brock Avenue. How often was surveillance done at that
24 location?
25 A    It varied at different points over the, a couple months of

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

29

1  the investigation. There was some time, a couple of days in a
2  row, there was some times where it was sporadic, one day a
3  week.
4  Q  Now, when you talk about going a couple of days in a row,
5  would this be for eight hours at a time?
6  A  No.
7  Q  How long at a time would it be?
8  A  The time would vary.
9  Q  Would it be longer than two hours say?
10 A  At times.
11 Q  But not as long as eight hours?
12 A  I have never been on an eight hour surveillance at the
13 house. There may have been New Bedford detectives on that.
14 Q  And again, if that had been done, would there have been a
15 report of it or would you have gotten some kind of oral report?
16 A  There may or may not have been a report on it.
17 Q  Do you recall looking at any kind of report concerning
18 those surveillance times?
19 A  Most of the surveillance information that I received is
20 verbal.
21 Q  So this would be officers saying, hey, we didn't see
22 anybody there really, but you testified to?
23 A  Or that they did see him.
24 Q  That they saw Mr. Rivera there. So sitting here you don't
25 know what times or exactly what dates they went to surveil this

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

30

1  particular address; is that correct?
2  A    That's correct.
3  Q    Did you become aware of where Mr. Rivera worked?
4  A    No, I didn't.
5  Q    Or how he was employed?
6  A    No, I didn't.
7  Q    The confidential informant did not know how he was
8  employed?
9  A    He may or may not have mentioned it.
10 Q    Again, but that would be in the debriefing perhaps?
11 A    It may or may not be.
12 Q    Did you ever make any attempts to learn where Mr. Rivera
13 worked?
14 A    I believe Detective Olivera did that.
15 Q    And did Detective Olivera tell you the results of his
16 investigation to where Mr. Rivera worked?
17 A    He may have.  I don't recall where he worked at this time.
18 Q    So did you ever become aware that he was working in
19 Boston?
20 A    I believe there was some mention of that, but the
21 particulars I don't recall.
22 Q    And did you understand that he was working in Boston on
23 that day last week on Thursday?
24 A    I knew he was at work from talking to those two
25 individuals.  I didn't know if it was in Boston.

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003