31

1  Q    And did you understand from them what kind of work he was
2  working doing?
3  A    I don't recall.
4  Q    You were aware that he came down from Boston in order to
5  turn himself in?
6  A    I believe he did, yes.
7  Q    Who was responsible for searching 508-510 Brock?
8  Here were ATF and federal police officers at that scene.
9  Q    And presumably there is or will be a report of that search
10 there?
11 A    Yes, there will.
12 Q    How many individuals were there, do you know?
13 A    I don't know the exact number.  It was approximately 10.
14 Q    And they seized a number of items from 508-510 Brock?
15 A    They did.
16 Q    You don't know what they are sitting here; is that
17 correct?
18 A    That's correct.
19 Q    You have not had reported to you that there was any
20 contraband found there?
21 A    I don't recall exactly what was found due to the large
22 scale of this investigation how much was involved.
23 Q    There were a lot of arrests down there in New Bedford; is
24 that correct?
25 A    Yes.

32

1  Q    If a large amount of drugs or really any drugs had been
2  found at 508-510, would you have expected someone to alert you
3  of that?
4  A    Yes.
5  Q    And no one did alert you of that; is that correct?
6  A    That's correct.
7  Q    The notes that you referred to about the day of the
8  arrest, these would be notes that were taken while talking with
9  both Agent Crook and also Sergeant Olivera.
10 A    The notes you're referring to are notes that have
11 information from conversations I had with both of those
12 individuals, but I called my supervisor this morning just to
13 refresh myself as to the particulars.
14 Q    So this note was written this morning?
15 A    That's correct.
16 Q    And it's based on just your conversations with Agent
17 Crook, right?
18 A    That's right, just to refresh my memory.
19 Q    All right. But you did not, for purposes of these notes,
20 talk to Sergeant Olivera today?
21 A    That's correct.
22 Q    I did talk to him today but not about this matter.
23       MR. WATKINS:  I have nothing further, your Honor.
24       MS. LEONEY:  Your Honor--
25       THE COURT:  Ms. Leoney, anything further?

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

33

1         MS. LEONEY: Yes, just very quickly, your Honor.

2                 REDIRECT EXAMINATION

3 BY MS. LEONEY:

4 With respect to the, back to the arrest of Mr. Rivera, in your

5 notes you refer to Mr. Rivera being coaxed. Do you recall that

6 information in your notes?

7         THE COURT: His being what?

8         MS. LEONEY: Coaxed. Coaxed, C-O-A-X-E-D.

9         THE COURT: Yeah, okay.

10 BY MS. LEONEY;

11 Q   Can you please tell the Court specifically what occurred

12 with respect to Mr. Rivera being coaxed that day?

13 A   The information I received from my supervisor was that

14 they had, I believe Mr. Rivera's daughter and his mother made

15 several attempts of phone calls in order to coax him to turn

16 himself in.

17 Q   And was it after they had coaxed him to turn himself in

18 that he turned himself in?

19 A   Yes.

20 Q   Now, with respect to the identity of Mr. Rivera, at some

21 point in February, March, did you attempt to verify the

22 information that was provided to you by the CI?

23 A   Yes, I did.

24 Q   And did you attempt, as part of that verification, to

25 verify the identity of the person, the person that the CI had

34

1  told you was Carol Rivera?
2  A   Yes, I did.
3  Q   And what, if anything, did you determine as part of that
4  verification?
5  A   I had several conversations with more than one New Bedford
6  police officer or detective.  He was very familiar with the
7  identity of Carlos Rivera and was familiar with the fact that
8  he resided at 508 Brock.  In addition to that, I had
9  discussions with New Bedford detectives through their in-house
10 information system, which they had pulled up any prior criminal
11 acts that they had on record in the in-house system in New
12 Bedford, I had reviewed some of that material.
13 Q   And did you also attempt to verify Mr. Rivera's identity
14 through arrest photos?
15 A   Yes.
16 Q   And did you obtain his arrest photo?
17 A   I obtained a photo of him that was on file with the New
18 Bedford police department.  Whether or not it's his arrest
19 file, I don't know, but it's a photo that accompanies his
20 record so what will happen is sometimes an arrest photo isn't
21 necessarily the photo that was taken at the time of arrest.
22 They may have pulled up the photo from the motor vehicle
23 department and that photo would be the official, but the photo
24 on record at the police department is the one I reviewed.
25 Q   And that would be the New Bedford police department?

1  A    That's correct.
2  Q    And with that arrest photo, were you and/or the
3  surveillance team able to match that photo up with the
4  individual that they had surveilled at 408-510 Brock Avenue?
5  A    Yes.
6  Q    Last thing is, did the first buy, the heroin from the
7  first buy, was that, was that heroin sent to the state lab for
8  analysis?
9  A    Yes, it was.
10 Q    And did you receive back the analysis report?
11 A    Yes, we did.
12      MS. LEONEY:  May I approach the witness, your Honor?
13      THE COURT:  Sure.
14 BY MS. LEONEY:
15 Q    I'm handing you a document and ask you to take a look at
16 that.  Do you recognize that?
17 A    Yes, I do.
18 Q    And what is that?
19 A    That's the confirmation from the state drug lab of the
20 April 1st buy and was, did test positive for heroin.
21 Q    And what was the date of the report?
22 A    The analization date was May 20th.
23 Q    And was it the, and who did the tests and analysis.
24 A    Danielle O'Prasca (ph).
25 Q    And she's with--

1  A    Assistant analyst, Danielle O'Prasca and Dennis Holmes
2  (ph).
3  Q    And where are they located?
4  A    At the drug lab.
5  Q    For the Commonwealth of Massachusetts?
6  A    Yes.
7         MS. LEONEY:  You're Honor, at this time, the
8  government would offer the drug analysis report with respect to
9  the first buy of the heroin?
10        THE COURT:  Any objection?
11        MR. WATKINS:  No objection.
12        THE COURT:  Government Exhibit 3.
13     (Government Exhibit No. 3, admitted)
14        MS. LEONEY:  I have no further questions, your Honor.
15        THE COURT:  All right.
16                    RECROSS EXAMINATION
17 BY MR. WATKINS:
18 Q    Again, going back to your notes, you used the word coaxes
19 in your notes and you've used that here today.  Again, this was
20 based on your conversations with Agent Crook; is that correct?
21 A    That's correct.
22 Q    And that was his summary of what the family had tried to
23 do--
24 A    Yes.
25 Q    -- as you understand it?

37

1  A    Yes.
2  Q    So you don't know exactly what kinds of conversations went
3  on between the family or whether there was any conversation; is
4  that correct?
5  A    I knew there were conversations.  To what extent, I don't
6  have first-hand knowledge.
7  Q    When you say you know there were conversations, how do you
8  know there are conversations between the family and Mr. Rivera?
9  A    Oh, I don't know about the conversations between
10 Mr. Rivera and his family.  I know that my supervisor told me
11 that they had called him.
12 Q    That the family had called him; is that correct?
13 A    Correct.
14 Q    And when you say the family, do you know who in the family
15 it was that spoke to him?
16 A    All I can tell you is that my supervisor mentioned his, I
17 believe his mother and his daughter.
18 Q    And they reported to him that they were trying to get
19 Mr. Rivera to report in; is that correct?
20 A    That's what I was told, yes.
21 Q    And in fact, that's what happened.  He reported in,
22 correct?
23 A    Correct.
24 Q    There were many individuals arrested in New Bedford over
25 that one or two days?

*Maryann V. Young*
**Certified Court Transcriber**
(508) 384-2003

1   A   That's correct.
2   Q   And there are many that are on the run now; is that
3   correct?
4   A   That's correct.
5   Q   And it's safe to say many of them did not report in to the
6   New Bedford police station after finding out that they were
7   wanted?
8   A   All that I can tell you is this, out of all of the
9   individuals that we had intended on arresting in that
10  operation, all of them had either been arrested or in the
11  process of making arrangements to turn themselves in.
12  Q   And Mr. Rivera turned himself in the same day that you
13  search his home?
14  A   Yes, he did.
15          MR. WATKINS: Nothing further, your Honor.
16          THE COURT: All right. You may step down. Thank
17  you, very much.
18          THE WITNESS: Thank you.
19          THE COURT: Does the government have any further
20  testimony it wants to present?
21          MS. LEONEY: No, your Honor.
22          THE COURT: Mr. Watkins, I notice I don't have a
23  pretrial services report on Mr. Rivera. Do you have any
24  testimony that you want to present?
25          MR. WATKINS: Not at this point, your Honor. we did,

39

1 Ms. Brown was kind enough to come in an interview Mr. Rivera
2 this morning. I know she did not have time to produce a
3 report, also did not have time to talk with Mr. Rivera's family
4 who is here in court. I think it might make a certain amount
5 of sense to do that before we formally conclude the hearing.
6          THE COURT: All right. How much time do you need?
7          MS. BROWN: I'll have it ready whenever you want.
8          THE COURT: No, no, let's make it convenient for you.
9 We've got a lot of people here so let's do it right.
10         MS. BROWN: This afternoon?
11         THE COURT: Yeah.
12         MS. BROWN: So you can conclude this today?
13         MR. WATKINS: Your Honor, at the risk of putting sand
14 into the wheels, I'm supposed to be at Wyatt detention center
15 for a pre-sentence interview at about 2:00. I don't know if
16 perhaps Ms. Brown could make an oral report after speaking with
17 the family or we can proceed in any other way the Court would
18 like.
19         THE COURT: I would prefer a written report. You
20 have to be there at 2:00?
21         MR. WATKINS: I will make arrangements to change
22 that, your Honor.
23         THE COURT: Well, it's 11:30. Do you want to, how
24 much time? 1:30?
25         MS. BROWN: Fine.

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003

40

```
 1          THE COURT:  Does that give you time?
 2          MR. WATKINS:  Yes, your Honor, that would be okay.
 3          THE COURT:  Can we do it at 1:30?
 4          THE CLERK:  Yes.
 5          THE COURT:  1:30.  I'm going to continue this matter
 6  than.  Ms. Leoney, you're available?
 7          MS. LEONEY:  Absolutely, your Honor.
 8          THE COURT:  Okay.  We're going to continue this
 9  matter to today at 1:30 p.m. to conclude this hearing.  All
10  right?
11          Court is in recess.
12  (Court adjourned until 1:30 p.m. this same day)
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
```

*Maryann V. Young*
Certified Court Transcriber
(508) 384-2003