UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
        v.                      )        CRIMINAL NO. 04-10192-NG
                                )
CARLOS RUBEN RIVERA             )


DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Carlos Ruben Rivera, submits this memorandum to aid the Court in advance of the sentencing hearing concerning the issue of sentencing factor manipulation.  In defendant's view, the hearing will establish that sentencing factor manipulation occurred when the government pressed the cooperating informant to purchase a firearm even in the face of defendant's manifest unwillingness to supply it.  The practical result of this manipulation was to double Mr. Rivera's advisory guideline sentencing range from 15-21 months to 33-41 months.

Defendant also submits that a statutory sentence of 18 months imprisonment, with a mandatory six-year period of supervised release to follow, is reasonable and appropriate pursuant to the factors set forth in 18 U.S.C. § 3553(a).

**FACTS**[1]

**Sentencing Factor Manipulation**

Mr. Rivera and the cooperating informant[2] grew up in the same area of New Bedford, Massachusetts.  The CI, now aged 52, is fifteen years older than Mr. Rivera and was part of the Cape Verdean community in New Bedford.  The CI lived two blocks over and was a relative and neighbor of Mr. Rivera's best friend.  Mr. Rivera was also friendly with the CI's older son Ebony and the CI's mother Albertina who lived upstairs from the CI during Mr. Rivera's formative years.  Because of the age difference, Mr. Rivera only knew the CI in a casual way as one of the grown-ups around the neighborhood who was therefore entitled to deference and respect.

The CI's criminal record is lengthy, dates back to nearly 30 years, and includes three commitments to MCI-Walpole (at age 23, age 26, and again at age 34).  The last of his state prison commitments was an 18-20 year sentence imposed in 1987 for, <u>inter alia</u>, armed robbery.  After parole, he apparently committed

---

[1]The facts that follow are taken from the Presentence Report or are the subject of expected testimony at the sentencing hearing.

[2]The Cooperating Informant, although known to Mr. Rivera, has not been publicly identified.  This Memorandum will continue to refer to the individual as the CI and redact identifying information to the extent possible.

another burglary that resulted in his re-commitment to Walpole. In 1990, a judge revised the sentence downward to 8-10 years.

In 1995, the CI was again arrested, this time on several drug offenses including possession with intent to distribute heroin in a school zone as well as assault and battery on a police officer. He was sentenced to aggregate sentence of two and one-half years in jail with 18 months of that term suspended.

Throughout the years, Mr. Rivera would see the CI in the neighborhood. The neighborhood is close and interrelated; for example, although not related by blood, Mr. Rivera thought of the CI's mother as an Aunt. Consequently, Mr. Rivera would see the CI's family regularly in a social capacity and the CI himself often in passing.

In April 2003, the CI was arrested once again on multiple counts of distribution and possession with intent to distribute heroin, as well as for carrying a dangerous weapon. He was charged in New Bedford District Court with offenses that included a five-year mandatory minimum state prison sentence because he was a prior drug offender and two and one-half year state prison sentence because he distributed drugs in a school zone. Those charges apparently precipitated his cooperation in the instant matter and other investigations in and around the city of New Bedford. On February 1, 2005, the CI was given a two-year jail sentence suspended for 18 months by the New Bedford District

-3-

Court.  The Commonwealth dismissed the counts that alleged
charges carrying a mandatory minimum sentence.

Meanwhile, the CI's son, identified as an active member of
violent street gangs around the New Bedford area, was on release
after a series of gun incidents around the New Bedford area.  The
CI's son was arrested on August 31, 2003 for possession of a
firearm after he himself had been shot;[3] according to newspaper
reports, the CI's son had also been a suspect in a 2001 homicide.
The CI's son was released on October 1, 2003 after a Bristol
County Superior Court judge lowered his bail to personal
recognizance.

By February 2004, a joint ATF-New Bedford Police task force
was investigating activities in the New Bedford area.  The CI was
registered as an ATF informant in late February for that
operation and was principally "handled" by ATF Special Agent
Brendan Hickey.  The CI apparently identified Mr. Rivera as a
possible source of guns and drugs.  Mr. Rivera, however, had not
sold contraband of any kind to the CI prior to the transactions
at issue.

According to Special Agent Hickey, agents suggested to the
CI that he initially try to obtain a gun from Mr. Rivera and

---

[3]The CI's son pled guilty to the firearms charges as well as
to subsequent drug offenses on February 28, 2005.  He was
sentenced to four years to four years and a day at MCI-Walpole.

-4-

preferably drugs and a gun at the same time.  Notwithstanding the agents' suggestions, the CI instead approached Mr. Rivera asking only if Mr. Rivera knew where he could get heroin.[4]  Although Mr. Rivera initially told him he did not and would not sell heroin, two weeks of persistent efforts featuring five to ten telephone calls (citing the family connections) by the CI to Mr. Rivera resulted in the April 1, 2004 transaction that is the subject of Count One of this indictment.  The CI purchased ten (10) grams of heroin from Mr. Rivera for $1,000.

The agents continued to push the CI to obtain guns and other drugs, particularly crack cocaine, from Mr. Rivera.[5]  Pursuant to the agents' suggestions, the CI began pressuring Mr. Rivera to obtain a gun for him.  This pressure took the form of continued appeals to Mr. Rivera's friendship as well as sympathy to the CI's purported predicament.  The CI explained to Mr. Rivera that people were looking for his son to avenge the CI's son's

---

[4]Neither Special Agent Hickey nor anyone else made any effort to record the telephone calls leading up to the April 1, 2004 heroin transaction.

[5]After suggesting to the CI that he obtain a gun (and later, crack cocaine) from Mr. Rivera, the agents chose only to electronically monitor and preserve recordings where the CI actually obtained items from Mr. Rivera.  They did not attempt to record telephone calls leading up to the transactions.  The CI would often have conversations with Mr. Rivera at which the agents were not present when the CI.  On those occasions when they were present, the agents declined to take notes or make other memorialization of the conversations.

participation in other shootings, and that the CI needed to have a weapon to defend himself in the event those people came after the CI.  The CI implored Mr. Rivera to supply the gun, saying that he feared for his family's safety including a young teenager.  Mr. Rivera suggested that the CI try to work out his differences with the individuals at issue; the CI refused.

The CI called Mr. Rivera seven to ten times to urge him to purchase a weapon for him.  Mr. Rivera repeatedly rebuffed those efforts until at last Mr. Rivera eventually gave in to the CI's persistent entreaties and bought a weapon to pass on to the CI. Even then Mr. Rivera nearly aborted the transfer of the weapon to the CI because of the CI's irresponsibility in taking the weapon as planned.  Finally, on April 19, 2004, the CI came to Mr. Rivera's home and, in a transaction that was videotaped, took the firearm for Mr. Rivera.  The sale of the gun is the basis for Count Two of the indictment, alleging Mr. Rivera with being a felon in possession of a firearm.  Mr. Rivera made no profit from his purchase and resale of the weapon to the CI.

Not content with the two offenses set up through the CI (and the concomitant penalties), two months later the agents directed the CI to obtain crack cocaine from Mr. Rivera.  Mr. Rivera refused to sell crack cocaine to the CI and instead supplied him with an ounce of powder cocaine for $1,100.  This June 18, 2004

cocaine transaction is the subject of Count Three of the
indictment.

Four days later, on June 22, 2004, agents sought and
obtained a warrant to search Mr. Rivera's home.  The June 24,
2004 search turned up paraphernalia and substances consistent
with steroid use; absolutely no additional narcotic substances or
firearms were recovered.

**Defendant's Personal History and Post-Offense Rehabilitation**

Mr. Rivera is a 37 year-old U.S. citizen who has lived in
New Bedford since the age of 10.  He was born in 1968 in Puerto
Rico, the fourth of five siblings.  Mr. Rivera's parents, Nilda
Rodriguez Fontanez and Victor Rodriguez, split up in the mid
'70's.  Mr. Rodriguez had little interest in maintaining ties
either to Nilda Fontanez or his family and his whereabouts are
currently unknown to anyone in the family.  In 1978, Mr. Rivera
(then 10 years old) moved with his mother and siblings to New
Bedford.  The entire family has remained in Massachusetts since
that time.  Mr. Rivera's mother, Nilda Fontanez, is also a U.S.
Citizen who is currently on disability.  All but one of Mr.
Rivera's siblings reside in the same neighborhood in New Bedford;
the remaining brother lives in Plymouth.

Mr. Rivera received an adult diploma from New Bedford High
School in 1987.  He attended both Bristol County Community
College and the University of Massachusetts at Dartmouth in the

late '80's and early '90's.  During the same period, unfortunately, Mr. Rivera became involved in the street life of New Bedford and wound up with the legal difficulties that resulted, five years later, in a one-year sentence to the Dartmouth House of Correction.

Determined to turn his life around, Mr. Rivera, upon his release from the jail sentence in 1995, pursued training as a heavy equipment operating engineer.  He successfully completed the rigorous training and apprenticeship programs and obtained a license in 1997.  This program featured a four-year course of study that required 2000 hours of training on heavy equipment as well as schoolwork, often on Saturdays and holidays.  He joined the International Operating Engineers Union Local #4 in Boston in 1999 and has been employed steadily through the union since then.

At the time of his surrender to the authorities in the instant matter, Mr. Rivera was earning an hourly rate of $35.50 through Don Martin Construction, who has employed Mr. Rivera for the last three years; before that, Mr. Rivera was employed by the Tilcon Capaldi Co. of New Bedford for five years.

At the time of the offenses here, Mr. Rivera had been married to Raubecka Rivera (neé Texeira) for seven years.  The Rivera's actual romantic relationship predated their marriage: the couple have known each other for more than 17 years.  The

couple have two children; Kaitlyn Rivera is 14 years old and
Carlos Rivera, Jr. is 10 years old.

The relationship had, at times, been contentious.  Ms.
Rivera sought temporary restraining orders at different stages of
the marriage.  There was no active restraining order in effect,
however, at the time of Mr. Rivera's arrest and the couple had
been living together for the year proceeding the offenses at
issue.  Although at the time of Mr. Rivera's surrender to police,
the couple was undergoing a trial separation with Mr. Rivera
staying in the marital home while Raubecka had her own apartment.
The couple negotiated and implemented a shared custody
arrangement for the children and Mr. Rivera exercised regular
visitation with them.  The couple's relationship throughout the
subsequent divorce proceedings has been amicable, and their
divorce has recently become final.

In the eight years leading up to the instant offenses, Mr.
Rivera worked as a heavy equipment operator to support the
family.  In addition, the Riveras bought and rehabilitated a
total of three homes, all in New Bedford, over the past eight
years.  They owned the home on Brock Ave. for two years, having
obtained it with a down payment of $32,000.  The home was heavily
leveraged at the time of the offenses; the couple spent
significant sums in an ultimately financially disastrous effort
to rehabilitate units in the building to prepare them for rental.

-9-

As a result, the couple faced a monthly mortgage payment of $1,800 as well as substantial debt service on home improvement loans.  The couple was in arrears on the mortgage and continually feared foreclosure of the property given the often unpredictable seasonal income Mr. Rivera provided.

Mr. Rivera, in his off hours, also strove to be an accomplished bodybuilder.  At the time of the offenses at issue, he had begun dabbling in steroid and other protein supplements to enhance his performance.

On June 24, 2004, Mr. Rivera was contacted at his job site and told that his home had been searched and that there was an arrest warrant outstanding for him.  He turned himself in to the New Bedford Police Department later that day.  He was initially ordered detained after a detention hearing by the Magistrate Judge and remained in Plymouth County Correctional Facility for nearly three months until September 14, 2004.  He was released on extremely restrictive conditions including a curfew that required him to be at home other than while at work.  Although the Court has made slight modifications to accommodate his work schedule and a change in address, the restrictive conditions have remained essentially unchanged during the nine months Mr. Rivera has been released.  During that period, Mr. Rivera has put his financial affairs in order, planned for the continued physical, financial, and psychological well-being of his ex-wife and children during

his contemplated absence while in prison, and made plans to relocate the Texas to begin a new once released.  Mr. Rivera has not violated <u>any</u> of the restrictive conditions of release during the pendency of this matter.

**ARGUMENT**

A.    THIS COURT SHOULD FIND THAT THE GOVERNMENT'S CONDUCT AMOUNTS TO SENTENCING FACTOR MANIPULATION AND SHOULD CONSIDER THAT CONDUCT WHEN FASHIONING A STATUTORY SENTENCE.

Sentencing factor manipulation occurs when government agents improperly enlarge the scope or scale of a crime in order to subject a defendant to a longer sentence.  <u>United States v. Montoya</u>, 62 F.3d 1, 4 (1st Cir. 1995).  The First Circuit has recognized the concept of "sentencing factor manipulation" and has suggested that sentencing courts "ha[ve] ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the guideline sentencing range."  <u>Id.</u> at 3 (citations omitted).  This is because such manipulation by government agents implicates due process concerns.  <u>United States v. Messino</u>, 55 F.3d 1241, 1256 (7th Cir. 1995).  The First Circuit has explicitly provided a mechanism - through departure - for manipulations because the sentencing guidelines, by their very nature, may afford the opportunity for the government to unfairly exploit sentencing factors so as to manipulate a defendant's sentence upwards.  <u>United States v. Connell</u>, 960 F.2d 191, 196 (1st Cir. 1992).

-11-

This is particularly true where, as here, the government engages in sting operations using confidential informants.  Id.; United States v. Lora, 129 F. Supp. 2d 77, 88 (D. Mass. 2001)(Gertner, J.).

As a result, the First Circuit has repeatedly emphasized that "[w]hen an accusation of sentencing factor manipulation surfaces, the judicial gaze should, in the usual case, focus primarily – though not necessarily exclusively – on the government's conduct and motives."  Gibbens, 25 F.3d at 31.  Of particular importance and primary focus in the sentencing factor manipulation inquiry are the specific reasons why agents guided the criminal conduct in question in the way they did.  United States v. Barbour, 2004 U.S. App. LEXIS 27079 at *5 (1st Cir. December 29, 2004), citing Montoya, 62 F.3d at 4.  See Lora, 129 F. Supp. 2d at 89-90 (distinguishing sentencing factor manipulation and its focus on the motives of law enforcement authorities from U.S.S.G. § 2D1.1 comment. n.15 departures which examine defendant's predisposition).

Here, defendant expects that the hearing will reveal testimony concerning the government's substantial and significant efforts and motives to force a sale of a firearm despite the lack of any course of conduct or significant predisposition by the

defendant to engage in such a transaction.[6]  Instead, the
government engaged, through its CI, in improper efforts to
enlarge the scale of the offense defendant was willing to commit.
In these circumstances, the Court should accept Montoya's
invitation to sentence below the otherwise applicable advisory
guideline and sentence defendant using the advisory range of 15-
21 months based solely on the narcotics at issue in Counts One
and Three.

     Judicial focus on the government's actions as it affects a
defendant's culpability is particularly appropriate in the
context of statutory sentencing.  After all, 18 U.S.C.
§ 3553(a)(1) mandates that sentencing courts must consider the
nature and circumstances of the offense when fashioning the
appropriate sentence.  Where, as here, one of the primary
contributors to the "nature" of the firearms transaction is the
government's own conduct in procuring it, the Court can and
should consider such a circumstance to determine a sentence that
is sufficient to effectuate a just sentence given the purposes of
sentencing.

---

     [6]Defendant has served a subpoena on the CI directing him to
appear at the July 26, 2005 plea and sentencing hearing.
Defendant would also anticipate calling Special Agent Hickey at
the hearing in regards to the sentencing factor manipulation
claim.

-13-

B.   A SENTENCE OF 18 MONTHS' IMPRISONMENT WILL PROMOTE THE
     SPECIFIC STATUTORY OBJECTIVES CONTAINED IN 18 U.S.C. §
     3553(A).

     (1)   A sentence of 18 months' imprisonment reflects the
           seriousness of the actual offenses, promotes respect
           for the law, and provides just punishment for the
           offense.

        The offense conduct here is serious and merits significant

punishment.  18 months in prison is significant punishment and

far better reflects the seriousness of defendant's conduct than

does the inflated 33-41 month guideline sentence range given the

relatively small amounts of drugs involved and the limited role

Mr. Rivera played - essentially acting as a conduit for the CI.

        Similarly, it cannot be seriously argued that, given the

conduct here in conjunction with Rivera's circumstances and

otherwise crime-free life at the time of the offense, a sentence

of 18 months is more than enough to promote respect for the law,

both specifically as to Rivera and generally as to the public at

large.  Notwithstanding his facially serious record of a

relatively ancient prior drug conviction, Rivera served only a

brief sentence at a county House of Correction facility.  The

proposed sentence will keep him incarcerated for an additional

year in federal prison as a result of his irresponsibility in

agreeing to assist a family friend.  The public's right to just

punishment for the offense is vindicated by Rivera's conviction

and punishment by a significant sentence.

-14-

    (2)  A sentence of 18 months affords adequate deterrence to criminal conduct

Rivera's efforts to build and maintain a productive lifestyle have been wrecked by his decision to assist the CI in obtaining the drugs and firearm at issue.  Similarly, the lives of his close family have been thrown into turmoil.  There can be little doubt that the sentencing and incarceration he will endure provide overwhelming deterrence to any thought of similar conduct in the future.

    (3)  A sentence of 18 months protects the public from further crimes of the defendant

Rivera's demonstrated commitment, while on pretrial release, to turning his life around, is significant indicia that the six-year period of close supervision upon his release will be more than ample to protect the public from any future crime.  At the end of his commitment and supervised release period, Rivera will be 44 years old, an age well beyond the ordinary age range where recidivism presents a continuing problem.  Moreover, his work skills and demonstrated responsibility to his work will provide him with long-term income, further diminishing the risk of recidivism.  Finally, his commitment to real change in his life is manifested by his and his family's desire to move to a new social setting in Texas, away from the New Bedford milieu that helped fuel his difficulties.

**CONCLUSION**

Defendant submits that the Court should find that sentencing factor manipulation occurred in this case, that defendant's post-arrest rehabilitation is extensive, and that under all of the circumstances a statutory sentence outside of the advisory guideline sentencing range is appropriate.  The Court should therefore sentence defendant to 18 months incarceration.  The Court should impose the six-year period of supervised release required by the government's decision to file an 21 U.S.C. § 851 notice in this case.  The Court should impose no fine.


                              CARLOS RUBEN RIVERA,
                              By his attorney,


                              /s/ Timothy G. Watkins
                              Timothy G. Watkins
                                B.B.O. #567992
                              Federal Defender Office
                              408 Atlantic Ave., 3rd floor
                              Boston, MA  02110
                              Tel: 617-223-8061


                              July 5, 2005