UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                               ) Criminal No. 04-10192-NG
         v.             )
                               )
CARLOS RUBEN RIVERA,       )
                               )
        Defendant.     )

GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE AND
IN OPPOSITION TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Michael J. Sullivan, United States Attorney, and Assistant U.S. Attorney Antoinette E.M. Leoney, submits this sentencing memorandum opposing claims of sentencing factor manipulation asserted by the Defendant, Carlos Ruben Rivera ("RIVERA").

RIVERA, through his sentencing memorandum, alleges that the government engaged in sentencing factor manipulation by pressing a cooperating informant to purchase a firearm from him even though, he had expressed a manifest unwillingness to supply it. RIVERA further asserts that the government manipulated the sentence in this fashion in order to double his applicable advisory guideline sentencing range from 15-21 months to 33-41 months. RIVERA also alleges that an 18 month sentence, with a six-year supervised release to follow, is appropriate, as it is reasonable pursuant to the factors set forth in 18 U.S.C. § 3553 (a). This being said, RIVERA's claims are unsupported by the facts and relevant case law. As discussed below, RIVERA's claims are without merit and thus, the recommendation for a downward

departure should be denied.

<u>FACTUAL SUMMARY</u>[1]

The defendant, CARLOS RUBEN RIVERA ("RIVERA"), plead guilty and will be sentenced on a three-count indictment, consisting of one count of Possession with Intent to Distribute, and Distribution of, Heroin, in violation of 21 U.S.C. § 841(a)(1), one count of Felon in Possession of Ammunition, in violation of 18 U.S.C. §922(g)(1), and one count of Possession with Intent to Distribute, and Distribution of, Cocaine, in violation of 21 U.S.C. § 841(a)(1).

<u>COUNT ONE</u> - Possession With Intent to Distribute, and
            Distribution of Heroin

During the course of this investigation, Special Agent Brendan C. Hickey of the Bureau of Alcohol, Tobacco and Firearms ("ATF") had a series of conversations with a confidential informant ("CI")[2], who voluntarily provided information concerning illegal narcotics and firearms transactions conducted by the defendant, Carlos Ruben Rivera ("RIVERA"), whom the CI stated he/she personally knew.  Among other things, the CI

---

[1]Except where noted, the factual summary is based on the defendant's change of plea colloquy and the government's version of the offense conducted as set out in Presentence Report prepared by the U.S. Probation Office.

[2]The identity of the CI was subsequently disclosed to the defendant through the automatic discovery process, but for purposes of this pleading, the identity of the CI will not be disclosed here.

indicated that RIVERA resided on the first floor of 508 Brock
Avenue in New Bedford, and that he/she had met with RIVERA in
that residence on several occasions.  The CI also told SA Hickey
that he/she had asked RIVERA if RIVERA could sell the CI
narcotics and handguns, and that RIVERA told the CI on numerous
occasions that he could, and would, sell the CI narcotics and
handguns.  RIVERA also told the CI that he had access to
different types of handguns that he would try to obtain and sell
to the CI.  SA Hickey was present during some of the telephone
conversations between the CI and RIVERA, and that he had
witnessed the CI discussing the purchase and sale of narcotics
and firearms with RIVERA during phone calls made to and from
RIVERA's cell phone number (508) 889-3023.

During the course of this investigation, SA Hickey learned
that the property located at 508-510 Brock Avenue in New Bedford,
is a two-story, three-family, clapboard structure with natural
shingles, wood trim and a slate roof cover.  The structure has
three units, a driveway and an unattached garage, and is located
on the east side of Brock Avenue in New Bedford, Massachusetts.
There are two separate front entrances to the structure, which
faces west, with steps leading from the walkway of 508-510 Brock
Avenue, to the front common entrances 508-510 Brock Avenue, and,
according to the City of New Bedford Assessor's records, is owned
by RIVERA.

The dwelling at number "508" consists of one apartment on the first floor, while the dwelling at number "510" consists of two separate apartments (referred to as "north" and "south"), both believed to be on the second floor. A utilities check was conducted by investigators for the first floor apartment at number "508" Brock Avenue, and revealed that the utilities for this apartment are listed under RIVERA's name. A utilities check for number "510" Brock Avenue revealed that the second floor south apartment is occupied by a female, and that the second floor north apartment is vacant and controlled by RIVERA, as he is the owner of the entire property located at 508-510 Brock Avenue. During the course of the investigation, a utilities check for the vacant apartment revealed that the utility electric bill was being forwarded to RIVERA at 508 Brock Avenue and that the bill was being paid by RIVERA.

On April 1, 2004, the CI made an undercover controlled purchase of 10 grams of heroin from RIVERA. Specifically, at approximately 4:20 p.m., on this date, Special Agents Robert J. White and John Pijaca conducted surveillance of the area in front of number 508 Brock Avenue. Simultaneously, in the presence of SA Hickey, the CI placed a phone call to RIVERA. The CI told RIVERA he had money and was ready to "make it happen." The CI was referring to him/her purchasing a "finger" (approximately 10 grams) of heroin from RIVERA. The amount of heroin (10 grams)

4

and the sale price ($1,000) were agreed upon by the CI and RIVERA through multiple prior telephone conversations, during some of which SA Hickey was present. During these same conversations, there were also references made to RIVERA regarding selling the CI a firearm at a future date. The conversation ultimately resulted in RIVERA telling the CI that he was ready for him/her, and to come by his house immediately with the money.

Before departing for RIVERA's residence, the CI was outfitted with a body transmitter (electronic monitoring) and audio recording equipment in order to record the transaction between the CI and RIVERA. The CI was provided with $1,000 in ATF funds to purchase the "finger" of heroin from RIVERA. SA Hickey searched the CI's vehicle and the CI's person for any personal money and/or contraband with negative results. The CI then departed for RIVERA's residence. SA Hickey and SA Kenneth Croke maintained visual contact with the CI and the CI's vehicle until the CI arrived at RIVERA's residence, at which time SA White maintained visual contact with the CI until he/she entered RIVERA's residence at 508 Brock Avenue.

Moments later, surveillance units listened via the ATF transmitter as the CI knocked on the first floor apartment door at 508 Brock Avenue, entered, and conducted a narcotics transaction with RIVERA. During the course of the transaction, RIVERA discussed several different handguns with the CI that

RIVERA stated he was attempting to procure for the CI.

After the CI completed the purchase, the CI departed RIVERA's residence, entered his/her car, and drove away. SA Hickey and SA Croke were provided with the CI's direction of travel, and immediately assumed visual contact with the CI's vehicle and followed it to a prearranged location. At the prearranged location, SA Hickey and SA Croke retrieved from the CI one clear plastic bag of suspected heroin, which was wrapped in aluminum foil. The CI stated that RIVERA requested $1,000 for the "finger" of suspected heroin. The CI confirmed that he/she had purchased the suspected heroin from RIVERA with the ATF funds he/she had been provided with. The CI was then searched for additional contraband/currency with negative results. During the debriefing, the CI also stated that the drug transaction took place in the main room - a parlor. The plastic bag of suspected heroin was weighed and placed into evidence at the New Bedford Police Department by Det. David Conceicao.

On May 20, 2004, the plastic bag and it's contents were examined and analyzed by the Commonwealth of Massachusetts Department of Public Health's State Laboratory Institute. The substance weighed 10.04 grams and was found to be heroin.

<u>COUNT TWO</u> - Felon in Possession of Ammunition

On April 18, 2004, the CI spoke with RIVERA and inquired again about obtaining a firearm from him. At that time, the CI

6

told RIVERA that he needed a firearm because of increased danger
to his/her son as a result of a shooting that occurred on Cottage
Street in New Bedford on day.  RIVERA told the CI that he had a
firearm to sell.  Later that evening, RIVERA showed up at the
residence of the CI and attempted to drop off the firearm with
another family of the CI, when RIVERA was told by that person
that the CI was not at home.  The family member asked RIVERA to
leave, but before leaving RIVERA showed a small firearm to the
family member and asked if he could leave the firearm in the
trash for the CI.  RIVERA was again told to leave and to take the
firearm with him.  The substance of this encounter is documented
in an ATF *Report of Interview*, prepared by SA Stephanie Schafer,
and dated April 26, 2004.  The report was previously provided to
the defendant through automatic discovery, and is bates stamped
as #006.

On April 19, 2004, at approximately 4:30 p.m., the CI made
an undercover controlled purchase of a firearm and ammunition
from RIVERA.  Specifically, on that date, the CI spoke with
RIVERA and made arrangements to purchase a firearm from RIVERA.
In the presence of SA Stephanie Schafer and Det. Sgt. Oliveira of
the New Bedford Police Department, the CI called RIVERA and made
plans to purchase the firearm at RIVERA's residence at 508 Brock
Avenue.  Prior to departing for RIVERA's residence, the CI was
searched by Det. Sgt. Paul Oliveira and outfitted with a body

7

transmitter and audio recording equipment in order to record the transaction between the CI and RIVERA.  The CI's vehicle was also searched.  The CI was provided with $400 in ATF funds by SA Schafer and was then followed to 508 Brock Avenue by SA Angelo "Tony" Thurman and Det. Sgt. Oliveira.  On the way to RIVERA's residence, the CI received a phone call from RIVERA wherein RIVERA told the CI that RIVERA was ready to make the deal.  The CI informed RIVERA that he/she was on the way to RIVERA's house and would meet RIVERA there.

A short while later the CI arrived at 508 Brock Avenue and waited for RIVERA.  SA Matthew O'Shaughnessy and Det. Christopher Dumont of the New Bedford Police Department observed the CI park his vehicle near the residence, and a few minutes later observed a dark-colored Ford truck pull into the driveway of 508 Brock Avenue.  The CI was then observed walking around the side of the house towards the rear of the building.  The CI was also heard conversing with RIVERA on the electronic audio transmitter device, and was heard telling RIVERA that he/she was sick of the problems on the streets and was going to go take care of a few things when he/she left with the firearm.  RIVERA was heard telling the CI that "the only good thing about those (referring to revolvers) is that they never get jammed - that's why the Mafia uses them."  RIVERA also told the CI to "be safe" as he/she was leaving the residence.

A few minutes later, the CI was observed in the rear porch area of 508-510 Brock Avenue holding a plastic bag and speaking with RIVERA.  The CI (still holding the plastic bag) then walked to the trunk of his/her vehicle, placed the bag in the trunk and departed the area.  SA Sheila O'Hara and Det. Jason Gomes of the New Bedford Police Department followed the CI back to the predetermined meeting location.  The CI turned over to SA Schafer a plastic bag labeled "Suncoast," which contained a U.S. Postal Service priority mail box and a "Stop and Shop" plastic bag. Inside the priority mail box was an Iver Johnson .38 caliber revolver bearing serial number H25373.  Inside the "Stop and Shop" plastic bag was a box of Remington .38 caliber ammunition with fifteen (15) spent shell casings and thirty-four (34) live rounds.

When the CI and RIVERA were inside 508 Brock Avenue they entered a kitchen/pantry area, where RIVERA pulled out the U.S. Postal Service priority mail box containing the firearm from under a sink area.  The CI paid RIVERA for the firearm and ammunition with the ATF funds he was provided with.

A Massachusetts State Police ballistics expert conducted an examination and analysis of the recovered ammunition, namely, fifteen (15) spent shell casings and thirty-four (34) live-rounds of Remington .38 caliber ammunition that the defendant is charged with, and determined that they are indeed ammunition.

9

## Interstate Commerce

The recovered ammunition, namely, fifteen (15) spent shell casings and thirty-four (34) live-rounds of Remington .38 caliber ammunition, was examined by SA Tony Thurman, who has been trained as an interstate nexus expert.  According to SA Thurman, no Remington manufactured ammunition is made in Massachusetts, and therefore this ammunition described in the indictment was manufactured outside of the Commonwealth of Massachusetts. Therefore, the ammunition would have had to travel in interstate and/or foreign commerce before RIVERA possessed it on April 19, 2004.

Further, Iver Johnson revolvers at one time were manufactured in the Commonwealth Massachusetts, but are no longer manufactured in the Commonwealth.  Because SA Thurman was unable to determine the year the recovered firearm, namely, an Iver Johnson .38 caliber revolver bearing serial number H25373, was manufactured, he was not able to confirm the interstate nexus relative to this firearm.  As such, RIVERA was not charged with firearm.

## Defendant's Prior Felony Conviction

Finally, RIVERA was a convicted felon at the time he sold and transferred the firearm and ammunition to the CI, having been convicted in Massachusetts Bristol Superior Court of a crime punishable by imprisonment for a term exceeding one year, and,

10

further, that he had not received a pardon from the Governor of
the Commonwealth of Massachusetts or otherwise had his right to
carry and/or possess firearms and ammunition restored.  RIVERA's
Massachusetts Criminal History Record indicates that RIVERA was
convicted in Bristol Superior Court on September 7, 1995 of
possession of a controlled substance with intent to distribute a
class B substance, to wit, cocaine, which is a crime punishable
by a term of imprisonment greater than one year.

     COUNT THREE - Possession With Intent to Distribute, and
                   Distribution of Cocaine

     On June 18, 2004, at approximately 11:30 a.m., SA Hickey
witnessed a telephone conversation between the CI and RIVERA.
RIVERA told the CI that he was "ready" for the CI.  RIVERA was
referring to an arrangement that he and the CI had made during
conversations in the prior days, where RIVERA told the CI he
would be ready to sell the CI cocaine on June 18, 2004.  RIVERA
then instructed the CI to call RIVERA just prior to the CI
arriving at RIVERA's residence at 508 Brock Ave, New Bedford.
Before departing for RIVERA's residence, the CI was outfitted
with a body transmitter and audio recording equipment in order to
record the transaction between the CI and RIVERA.  The CI was
provided with ATF funds in the amount of $2,200 to purchase the
cocaine from RIVERA.  Investigators searched the CI's person and
search the CI's vehicle for any personal money and/or contraband
with negative results.  Investigators were already conducting

surveillance at RIVERA's residence when the CI placed a second call to RIVERA, notifying him that the CI would be arriving shortly.  SA Hickey and SA Croke followed the CI from the pre-arranged meeting location to RIVERA's residence, at which time the aforementioned surveillance units assumed the surveillance of the CI.

    The CI entered the front door of 508 Brock Ave, while the surveillance units listened to the audio monitoring equipment. The CI had a brief discussion with RIVERA, at which time RIVERA agreed to sell the CI one (1) ounce of cocaine for $1,100 in U.S. currency.  SA Hickey then heard RIVERA tell the CI to wait in the first floor apartment while RIVERA retrieved the cocaine.  At that time, the CI saw RIVERA walk through RIVERA's kitchen at the rear (east) end of the first floor apartment, through the rear door of the apartment, into a hallway, and ultimately up a flight of stairs leading to the second floor inside, rear area of the dwelling located at 510 Brock Avenue.  When RIVERA left the first floor apartment and went upstairs he had no property (such as, plastic baggies, scale or other drug paraphernalia) on his person.  Once upstairs, RIVERA remained there for  approximately four or five minutes before returning to the first floor apartment with a plastic baggie filled with cocaine.  RIVERA handed the cocaine to the CI, and the CI and RIVERA then discussed future purchases of crack cocaine that RIVERA stated he

would be able to facilitate for the CI.

The CI subsequently departed 508 Brock Ave, at which time surveillance units notified SA Hickey of the CI's direction of travel.  SA Hickey and SA Croke maintained continuous visual contact with the CI once the surveillance units relinquished their surveillance of the CI.  At their pre-arranged meeting location, the CI gave SA Hickey a clear plastic bag containing suspected cocaine.  The CI confirmed that he/she had purchased the suspected cocaine from RIVERA with the ATF funds that he/she had been provided with.  The CI also confirmed that he/she paid RIVERA $1,100 for the suspected cocaine.  The CI returned the remaining $1,100 that he had been given in ATF funds to SA Hickey, who then searched the CI for additional contraband/currency with negative results.

The plastic bag of suspected cocaine was weighed and placed into evidence at the New Bedford Police Department.  On June 29, 2004, the plastic bag and it's contents were examined and analyzed by the Commonwealth of Massachusetts Department of Public Health's State Laboratory Institute.  The substance weighed 28.14 grams.

Apartment 510 North on the second floor had an active electricity bill sent to RIVERA at RIVERA's 508 apartment, and that a check with the City of New Bedford Assessor's Office revealed that RIVERA had owned the entire dwelling and property

at 508-510 Brock Avenue for approximately a year and a half.

**ARGUMENT**

There is no evidence that a downward departure should be awarded to Rivera based on the claim of sentencing factor manipulation from the sales of narcotics, a firearm and ammunition from 508-510 Brock Avenue, New Bedford, Massachusetts. The government did not overbear the will of Rivera, as he had a predisposition to sell both narcotics and firearms [and ammunition].  The government is given "broad latitude" to investigate criminal activity, thus it can lengthen an investigation to explore the size, techniques and participants involved in a criminal operation.  This being said, the Rivera investigation indicates that there was nothing extreme or outrageous about the conduct on behalf of the government.  Though the government had no undercover agents buying directly from Rivera, they utilized a CI to expose Rivera's predisposition and ability to sell narcotics, firearms and ammunition.

A.    THE DEFENDANT HAD THE PREDISPOSITION AND ABILITY TO SELL FIREARMS, AMMUNITION AND NARCOTICS AND THE GOVERNMENT'S ACTIVITY IN INVESTIGATING THE DEFENDANT WAS NEITHER COERCIVE NOR EXTREME AND OUTRAGEOUS TO WARRANT THE CONSIDERATION OF SENTENCE FACTOR MANIPULATION

Sentencing factor manipulation is a claim that can only be sustained by a showing of "extraordinary misconduct" on the part of the government.  United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995); United States v. Rizzo, 121 F.3d 794, 801 (1st Cir. 1997).

14

In asserting a claim for sentencing factor manipulation, the defendant bears the burden of showing by a preponderance of the evidence that the government employed this "extraordinary misconduct" to raise the defendant's sentence. United States v. Gibbens, 25 F.3d 28, 31-32 (1st Cir. 1994); Rizzo, 121 F.3d at 801; Montoya, 62 F.3d at 4. Thus, sentencing factor manipulation is a fact-bound determination conducted on a case-by-case basis and subject to clear-error review. United States v. Fontes, 2005 WL 1684388 *6 (1st Cir. July 20, 2005); Gibbens, 25 F.3d at 31; See United States v. Connell, 960 F.2d 191, 196 (1st Cir. 1992). Additionally, the standard for sentencing factor manipulation is high because such a claim could potentially result in a reduction at sentencing. Montoya, 62 F.3d at 4, See Rizzo, 121 F.3d 801. Therefore, it has been stated that "garden variety manipulation claims are largely a waste of time." Id.

This Circuit has held that sentencing factor manipulation occurs when the government ventures outside the scope of a legitimate investigation and engages in extreme and outrageous misconduct that improperly enlarges the scope and scale of the crime. United States v. Villafane-Jimenez, 410 F.3d 74, 87 (1st Cir. 2005); United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004); See United States v. Egemoyne, 62 F.3d 425, 427 (1st Cir. 1995). This can be established by showing that the government overpowered the free will of the defendant and coerced him into

15

committing a more serious offense than he was predisposed to commit. <u>Connell</u>, 960 F.2d at 196; <u>Barbour</u>, 393 F.3d at 86; *See* <u>United States v. Woods</u>, 210 F.3d 70, 75 (1st Cir. 2000). When there is a claim of sentencing factor manipulation, the "judicial gaze" should primarily, though not exclusively, focus on the government's motives and actions. <u>Gibbens</u>, 25 F.3d at 31; *see also* <u>United States v. Brewster</u>, 1 F.3d 51, 55 (1st Cir. 1993); *see* <u>Connell</u>, 960 F.2d at 194 (discussing the need to focus more on government's activity than on defendant's predisposition). However, this Circuit more recently has made clear that the defendant's own predisposition has evidentiary significance in assessing the government's motives and conduct. <u>United States v. Fontes</u>, 2005 WL 1684388 *6 (1st Cir. July 20, 2005).

Indeed, the First Circuit has held that "undercover sting operations comprise a valuable and generally lawful, weapon in the government's armamentarium." <u>Gibbens</u>, 25 F.3d at 31; *see also* <u>Connell</u>, 960 F.2d at 194. Therefore, the government is free within a "broad latitude" to extend an investigation and to set such snares necessary to catch unwary criminals. <u>Barbour</u>, 393 F.3d at 86; <u>Gibbens</u>, 25 F.3d at 31. The purpose of a sting operation is to tempt the criminally inclined, and "a well constructed sting is often crafted to test the limits of the target's criminal inclinations." <u>Fontes</u>, 2005 WL 1684388 *7 (1st Cir. July 20, 2005); <u>Montoya</u>, 62 F.3d at 4. Additionally, it has

16

been held that where a sentence is determined by the quantity of
drugs, the government could potentially manipulate the sentence
by structuring the investigation to get requisite amount of drugs
for a stiffer sentence.  United States v. Lora, 129 F.Supp.2d 77,
88 (D. Mass. 2001)(Gertner, D.J.).  However, the First Circuit
has upheld the denial of a claim of sentence factor manipulation,
when the government agents' motives were mixed and not of
crystalline purity but, the defendant was the target of a
legitimate sting operation that was objectively reasonable in
extent.  Fontes, 2005 WL 1684388 *6 (1st Cir. July 20, 2005); see
also Egemoyne, 62 F.3d at 428 (1st Cir. 1995).

        Here, RIVERA has submitted no evidence to suggest that the
government agents engaged in extraordinary misconduct or that the
agents engaged in conduct that would "overbear the will of a
person predisposed to committing a lesser crime." Connell, 960
F.3d at 196.  Based on the facts of the instant case, RIVERA has
made an unsubstantiated claim of sentence factor manipulation.
RIVERA, in alleging this claim has failed to meet his burden of
proving sentence factor manipulation.  Therefore, this groundless
claim, asserted by RIVERA, should be seen as a "garden variety"
manipulation claim and therefore, should be disregarded.  Rizzo,
121 F.3d at 801.

        The government did not meet the requirements for sentencing
factor manipulation laid out in the Villafane-Jimenez case

because the ATF agents did not venture outside the scope of the investigation or employ extreme and outrageous conduct in order to get the defendant to sell narcotics, a firearm and ammunition. Here, ATF became aware that RIVERA had the predisposition to sell such contraband and thus, had the CI set up orders to purchase narcotics and a firearm with ammunition.  As indicated in the Fontes decision, RIVERA's predisposition, which is documented by the fact that he has a previous narcotics conviction out of Bristol County Superior Court, serves an evidentiary significance in determining that the government was not unjustly targeting the defendant and forcing him to partake in activity against his will.

ATF, employing a lawful weapon in its "armamentarium", set up a carefully crafted sting operation in order to investigate RIVERA's involvement in the movement of narcotics and firearms throughout the New Bedford area.  Gibbens, 25 F.3d at 31.  There was nothing extraordinary about this case, as this was a routine investigation conducted through a routine ATF undercover sting operation.  Like the Fontes decision, the ATF agents, operating on information provided by the CI, sought to tempt RIVERA, a person predisposed to commit illegal drug and firearm activity, to demonstrate his criminal inclinations.  The fact that ATF agents, through the CI, were able to get RIVERA to sell narcotics, a firearm and ammunition was not a case of sentencing

18

factor manipulation at all; rather, it was ATF conducting solid police investigative work in determining whether RIVERA was willing and able to put such contraband onto the streets.

The fact that RIVERA consistently reached out to the CI, regarding the purchase of narcotics and a firearm, counters any claim by him that he was an unwilling and coerced participant in the sale of narcotics, firearm and ammunition to the CI.  When RIVERA procured the illegal contraband, it was RIVERA who called the CI stating that he was ready to make the deal.  When told by the CI that he needed a firearm because of increased danger to his/her son as a result of a shooting that occurred on Cottage Street in New Bedford, it was RIVERA who told the CI that he had a firearm to sell.  And, it was RIVERA who, later that evening, showed up at the CI's home and in the CI's absence attempted to drop off the firearm with another family member of the CI. Indeed, it was RIVERA who, in spite of the CI's absence, showed the firearm to the family member and asked if he could leave the firearm in the trash for the CI.  All of this runs contrary to the <u>Connell</u> holding, as it shows that RIVERA was not a person under pressure to commit a crime but rather, that he was inclined to profit off the sale of the illegal contraband.  Furthermore, the fact RIVERA had the drugs in his home and did not have to leave that location to retrieve them demonstrates that he was not unfamiliar or uncomfortable with the sale of narcotics.

Additionally, the fact that RIVERA was willing to sell to the CI on more than one occasion evinces that he was conducting his usual course of business and not being overborne by any pressure from the government.  *See* <u>Connell</u>, 960 F.2d at 196.

Moreover, RIVERA told the CI that he had access to different types of handguns and, when he finally procured one for the CI, he pointed out the benefits of the revolver that he sold the CI by stating that it is used by the Mafia, as it never jams.  This demonstrates that RIVERA was a willing and calculating participant in the sales, who was acting on his criminal inclinations to sell guns and ammunition.  The fact that the CI stated to RIVERA that he was buying the gun and ammunition to take care of some things on the street, highlights that RIVERA was not reluctant to sell the firearm but was more than willing to sell it, as he tacitly understood the purpose that this gun and ammunition would serve on the street.

The instant case is distinguishable from the <u>Lora</u> case in that it is not a reverse sting operation, where the government had offered to sell cocaine at below market to get the defendant to buy a higher quantity of cocaine for sentencing purposes. RIVERA was willingly meeting the CI's orders for a firearm, ammunition and narcotics.  The ATF agents' conduct in investigating RIVERA was in no way outrageous or extreme.  As has been stated, this was a routine investigation, using information

provided by a CI, to eradicate illegal narcotic and firearm sales in the New Bedford area.  Also unlike the Lora, the government's motive in having RIVERA sell the CI a firearm, as well as, narcotics was not merely to rachet up his federal sentence but to confirm RIVERA's ability and willingness to sell narcotics, firearms and ammunition so that, he would be properly charged and sentenced.  And, of course, the government's motive does not have to be "crystalline pure" where RIVERA was the target of a legitimate and objective ATF investigation.  Fontes, 2005 WL 1684388 *6 (1st Cir. July 20, 2005).

Additionally, this case is unlike the Lora case, where the defendant predisposed to commit a lesser offense is coerced by the government into committing a more serious offense.  When the CI initiated contact with RIVERA, RIVERA was aware from the beginning that the CI had the intentions of purchasing a firearm and making multiple drug transactions.  RIVERA took steps to plan for the subsequent transactions and demonstrated his predisposition to commit the illegal sales of both a "finger" of heroin, a firearm, ammunition and the twenty-eight grams of cocaine.  Therefore, the government did not coerce RIVERA against his will rather, they, during the investigation, seized an opportunity to remove an illegal drug and firearm dealer from the streets of New Bedford.

B.    A SENTENCE OF 33-41 MONTHS IMPRISONMENT IS PROPER FOR THE
      OFFENSES COMMITTED BY THE DEFENDANT AND WILL MEET THE
      STATUTORY OBJECTIVES IN 18 U.S.C. § 3553 (A)

The proposed sentence for RIVERA is a fitting punishment relative to the seriousness of the offenses.  RIVERA was not hesitant in selling the CI narcotics, a firearm and ammunition, which demonstrates that he was in tune with the sales of these items, and not someone simply acting to help out a family friend. Additionally, RIVERA has a prior conviction for possession of cocaine with intent to distribute, which indicates that he is no stranger to the business of drug sales.  If he were merely acting as a conduit to a desperate family friend, as the defense would have us believe, RIVERA would have steered the CI to a person, who could sell him both drugs and a firearm.  However, RIVERA sold the CI narcotics and, as the facts indicate, he had the heroin in his first floor apartment, and only had to go to his upstairs apartment to retrieve the cocaine.  Thus, RIVERA had the access and ability to sell drugs and guns and he is someone who was looking to profit off of their sale.

A sentence of anything less then 33-41 months would be a miscarriage of justice.  RIVERA has a previous narcotics conviction, therefore, this case shows that it was not a sufficient deterrent to keep him from selling firearms and narcotics, which both pose a danger to the community at large. RIVERA had every opportunity to refuse the CI's orders for drugs

and a firearm, however, the facts show that RIVERA willingly sold and continued the relationship with CI, so as to profit from the sale of heroin, cocaine and a revolver.  As a result, RIVERA, who has a predilection for such crimes, must be properly punished for his illegal acts thus, a fitting and reasonable sentence is within the 33-41 months imprisonment range under both 18 U.S.C. § 3553(a) and the advisory United States sentencing guidelines.

<u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, RIVERA's claims are without merit, and thus, the government respectfully requests that the Court deny his request for a downward departure, and sentence the Defendant within the 33-41 months imprisonment range.  The Court should also impose the six-year period of supervised release, as the government has filed a 21 U.S.C. § 851 notice in this case, as well as a low-end guideline fine [unless the court finds that Defendant is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay a fine].

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:   /s/Antoinette E.M. Leoney
ANTOINETTE E.M. LEONEY
Assistant U.S. Attorney
(617) 748-3103

Date: August 19, 2005

<u>CERTIFICATE OF SERVICE</u>

Suffolk, ss.                          Boston, Massachusetts
                                      August 19, 2005

     I, Antoinette E.M. Leoney, Assistant U.S. Attorney, certify
that I caused a copy of the foregoing to be served by electronic
notice and by hand to Timothy Watkins, Esq., Federal Defender's
Office, the counsel of record.


                              /s/Antoinette E.M. Leoney
                             ANTOINETTE E.M. LEONEY
                             Assistant U.S. Attorney

24